UNITED STATES DISTRICT COURT
FOR THE DISCTRICT OF COLUMBIA

| | | |
|---|---|---|
| The City of Dover, New Hampshire | : | |
| The City of Portsmouth, New Hampshire | : | |
| The City of Rochester, New Hampshire | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | Civil Action No:_____ |
| | : | |
| The United States Environmental Protection | : | |
| Agency, and Lisa P. Jackson, in her official | : | |
| capacity as Administrator of the United States | : | |
| Environmental Protection Agency | : | |
| | : | |
| The United States Environmental Protection | : | |
| Agency, Region 1, and H. Curtis Spalding, in | : | |
| his official capacity as Regional Administrator | : | |
| of the United States Environmental Protection | : | |
| Agency, Region 1 | : | |
| **Defendants.** | : | |
| _____ | : | |

Plaintiffs, the New Hampshire cities of Dover, Portsmouth, and Rochester, file this complaint seeking relief in the nature of a mandamus, declaratory judgment and injunctive relief, and allege as follows:

I.   **INTRODUCTION**

1.   This case arises out of the United States Environmental Protection Agency's ("EPA") failure to fulfill the mandatory requirements of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251 *et seq*.

2.   Plaintiffs bring this action pursuant to provisions of Section 505(a)(2) of the Clean Water Act, 33 U.S.C. § 1365(a)(2), which provides for citizen suits against EPA to compel the Agency to comply with its nondiscretionary duties under the Clean Water Act.

3.   In this case, Plaintiffs seek to compel Defendants to comply with EPA's statutory obligations associated with the review of new and revised water quality standards under  33 U.S.C. § 1313(c)(2)(A), as implemented through EPA's regulations at 40 C.F.R. §§ 131.6, 131.20, & 131.21, and EPA's requirements to provide for and encourage public participation in the development and revision of state water quality standards under 33 U.S.C. § 1251(e).

4.   Plaintiffs also seek a judicial determination with respect to their legal rights under the Clean Water Act.  Specifically, Plaintiffs contend that EPA failed in its mandatory duty to review New Hampshire's revised water quality standards for Great Bay as set forth in a document entitled  *Numeric Nutrient Criteria for the Great Bay Estuary June 2009*" ("2009 Criteria").  A true and correct copy has been attached as Ex. 1.

5.   Plaintiff further contends that Defendants did not comply with the notice and hearing provision for review and revision of water quality standards and failed to encourage and promote public participation in the revision of water quality standards.  Defendant, however, does not believe its mandatory duty to review and approve new or revised water quality standards was triggered and that the allegedly revised standards did not need to go through a public rulemaking process.  A declaratory judgment would ensure that the new water quality standards set forth in the 2009 Criteria are properly adopted and prevent EPA and New Hampshire from basing regulatory decisions on illegally adopted water quality standards.

6.   Finally, Plaintiffs also seek to have EPA enjoined from making or approving CWA § 303(d), 33 U.S.C. §1313(d), listing determinations and issuing or approving National Pollutant Discharge Elimination System ("NPDES") permits based on the 2009 Criteria, as such criteria are not applicable standards under the Clean Water Act.

## II.   PARTIES

7.   The Plaintiffs are New Hampshire municipalities which own and operate Publicly Owned Treatment Works ("POTWs") that discharge to the Great Bay Estuary or receiving streams which flow into the Great Bay Estuary.  Specifically, the Plaintiffs include:

   a.   The City of Dover, with a principal place of business located at 228 Central Avenue, Dover, NH 03820;

   b.   The City of Portsmouth, with a principal place of business located at 1 Junkins Avenue, Portsmouth, NH 03801; and

   c.   The City of Rochester, with a principal place of business located at 31 Wakefield Street, Rochester, NH 03867.

8.   The acts and omissions of EPA alleged herein have deprived the Plaintiffs of their due process rights, which should have been afforded if the appropriate state and federal rulemaking provisions and the statutorily proscribed water quality standard review process had been followed.  Moreover, EPA's acts and omissions have resulted in legally flawed and scientifically unsound regulatory determinations that have and/or will cause significant financial injury to the plaintiffs.  Specifically, as a result of the EPA's failure to review the revised water quality standards at issue and/or EPA's failure to encourage and promote that the revised standards be adopted through a public rulemaking process, Plaintiffs will have to spend millions of dollars to modify their plants to comply with permit limitations that have or will be imposed.  In addition, to achieve the water quality standards announced in the 2009 Criteria, the Plaintiffs will also be subjected to similarly severe limitations on storm water discharges in the future, leading to additional millions of dollars in treatment costs.

9.   Plaintiffs are "citizens as defined by 505(g) of CWA, 33 U.S.C. § 1365(g), and "persons" as defined by 5 U.S.C. § 551(2).

10. Defendant EPA is the United States agency responsible for implementing the CWA, including the requirements of CWA § 303(c), 33 U.S.C. § 1313(c).

11. Defendant Lisa P. Jackson is the Administrator of the EPA and is sued in her official capacity only.

12. Defendant EPA Region 1 is responsible for administering and implementing section 303(c) of the CWA in New Hampshire.

13. Defendant H. Curtis Spalding, Regional Administrator of EPA Region 1, is charged with the oversight of EPA decisions and actions under the CWA, including the requirements of CWA § 303(c), 33 U.S.C. § 1313(c).

### III.   JURISDICTION AND VENUE

14. On September 13, 2012, via counsel, the New Hampshire cities of Dover, Portsmouth, and Rochester sent a letter to the EPA Administrator and the Regional Administrator (Region 1) informing the Agency of their intent to file suit to compel EPA to undertake certain nondiscretionary acts under the CWA.  Specifically, this letter notified EPA that the communities' lawsuit would seek to compel EPA to (1) ensure that any New Hampshire criteria modification reflects the latest scientific information and undergoes the applicable public review process and 2) require EPA to formally review New Hampshire's revised water quality standards for total nitrogen ("TN"), chlorophyll 'a', and water clarity pursuant to 33 U.S.C. § 1313(c)(2)(A), prior to their use in the regulatory process.  A true and correct copy of this NOI letter has been attached as Ex. 2.

15. This Court has jurisdiction of this civil action under 28 U.S.C. § 1331 (federal question); 33 U.S.C. § 1365(a) (citizen suits for violations of the CWA); 28 U.S.C. § 1361 (action in the

nature of mandamus to compel an officer or employee of the United States or any agency thereof

to perform a duty owed to Plaintiff); and 28 U.S.C. § 2201 (declaratory relief).

16. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of

the events or omissions giving rise to the claim arose in Washington, D.C.; EPA's headquarters

are located in Washington, D.C.,; and under 28 U.S.C. § 1391(e) because it is a civil action

against the United States, its agencies and/or officers or employees of those agencies acting in

their official capacities.

## IV.   REGULATORY BACKGROUND

17. Section 303 of the CWA requires states to establish water quality standards ("WQSs")

subject to review and approval by EPA.  33 U.S.C. § 1313(a)-(c).  WQSs consist of (a)

designated uses of the state's waters, (b) numeric and narrative criteria necessary to protect the

designated uses, and (c) and "antidegradation" policy and implementation plan for waters that

meet or exceed their corresponding WQSs.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.6.

18. EPA must review all new or revised state WQSs to determine if they are consistent with

the CWA.  33 U.S.C. § 1313(c)(2)(A).

19. This review must occur prior to any use of the WQSs within the state or federal

regulatory program.  *Alaska Clean Water Act Alliance* v. *Clarke*, 1997 U.S. Dist. LEXIS 11144,

27 ELR 21330 (W.D. Wash. 1997) (new and revised state water quality standards are not

effective for Clean Water Act purposes until approved by EPA).

20. This duty to review is triggered even if a state fails to submit a new or revised WQS, so

long as a state action constitutes the modification or amendment of existing WQSs.  *Miccosukee*

*Tribe of Indians v. EPA*, 105 F.3d 599, 602 (11th Cir. 1997); *Fla. Pub. Interest Research Group*

*Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070 (11th Cir. 2004).

21. Under EPA's statutory and regulatory requirements, this review shall ensure that the standards include, *inter alia*, (1) designated uses that are consistent with the CWA, (2) information concerning the methodology for choosing these uses, (3) water quality criteria sufficient to protect the designated uses, (4) an antidegradation policy to prevent clean waters from slipping below applicable standards, (5) a certification that the water quality standards were properly adopted in a manner consistent with state law and (6) general information useful in aiding the Agency's review. 33 U.S.C. § 1313(c)(d)(4); 40 C.F.R. § 131.6(a)-(f); 40 C.F.R. § 131.20(b).

22. If EPA determines that a new or revised WQS is consistent with the CWA, EPA must, within 60 days, approve the new or revised WQS. 33 U.S.C. § 1313(c)(3). Thereafter, the new or revised WQS is the applicable WQS for the state. *Id.*

23. If EPA determines that a new or revised WQS is not consistent with the CWA, EPA must, within 90 days, notify the State and specify the changes necessary to be consistent with the CWA. 33 U.S.C. § 1313(c)(3).

24. If the state does not correct the new or revised WQS in accordance with EPA's changes within 90 days, EPA shall promptly "prepare and publish proposed regulations setting forth a revised or new water quality standard." 33 U.S.C. § 1313(c)(3) and (c)(4)(A). After publishing the proposed regulations, EPA must promulgate any such revised or new standard within 90 days, unless in the interim the state has cured the defect. 33 U.S.C. § 1313(c)(4).

25. EPA's obligation to review new or revised WQSs applies regardless of whether the water quality standard at issue is a numeric or narrative criterion. Accordingly, narrative criteria interpretation approaches must undergo the same public review and adoption process as numeric criteria. 40 C.F.R. §§ 131.13 and 131.21.

26. The CWA and implementing regulations mandate that all new or revised narrative criteria interpretation approaches must undergo a public review and adoption process before being used in the regulatory process pursuant to EPA's Alaska rule.  40 C.F.R. §§ 131.6 131.20 and 131.21.

27. EPA has stated that a revised WQS includes any "[p]rovisions that affect attainment decisions made by the State and that define, change, or establish the level of protection to be applied in those attainment decisions, [which] affect existing standards implemented under section 303(c) of the Act. These provisions constitute new or revised water quality standards." *See attached* Ex. 3, United States Environmental Protection Agency Determination on Referral Regarding Florida Administrative Code Chapter 62-303, Identification of Impaired Surface Waters, July 6, 2005, at 9.

28. EPA guidance on nutrient criteria development specifies that formal adoption must occur for both (a) new or revised numeric criteria and, (b) new or revised narrative criteria translator approaches for developing case-specific numeric nutrient crtieria.

29. Under Section 101(e) of the CWA, EPA has an affirmative duty to provide and encourage public participation in the development or revision of any EPA or state standard.  33 U.S.C. §1251(e) ("Public participation in the development, revision… of any … standard … established by the Administrator or any State under this Act shall be provided for, encouraged, and assisted by the Administrator and the States.").

30. Under Section 303(d) of the CWA, the Administrator is required to review proposed listings of waters that fail to meet the "water quality standards applicable to such waters" and "approve or disapprove" such submission.  33 U.S.C. § 1313(d).

31. "Applicable water quality standards" are those formally adopted and approved by EPA pursuant to Section 303(c).  33 U.S.C. § 1313(c).

7

32. The Administrator is not authorized to approve a CWA § 303(d) impaired waters list that is based on the application of water quality standards that have not been formally adopted by a state and approved by EPA.

## V.   FACTUAL BACKGROUND

### *New Hampshire's duly promulgated standard for nutrients and associated biological response variables*

33. The only duly promulgated New Hampshire water quality standard that addresses nutrients reads as follows:

> (a)  Class A waters shall contain no phosphorus or nitrogen unless naturally occurring.
>
> (b) Class B waters shall contain no phosphorus or nitrogen *in such concentrations that would impair any existing or designated uses*, unless naturally occurring.
>
> (c) Existing discharges containing either phosphorus or nitrogen *which encourage cultural eutrophication* shall be treated to remove phosphorus or nitrogen to ensure attainment and maintenance of water quality standards.
>
> (d) There shall be no new or increased discharge of phosphorus into lakes or ponds.
>
> (e) There shall be no new or increased discharge(s) containing phosphorus or nitrogen to tributaries of lakes or ponds that would contribute to cultural eutrophication or growth of weeds or algae in such lakes and ponds.

Env-Wq 1703.14 (emphasis added).

34. Aside from its application to class A waters, this standard is a narrative, meaning it does not set specific numeric thresholds or prohibitions whereby a stream may be categorized as nutrient impaired.

35. The existing New Hampshire narrative standard does not classify a waterbody as impaired merely because nitrogen (or phosphorus, or chlorophyll-a, or visibility) is found at a certain concentration or level.

36. The existing New Hampshire narrative standard bases compliance decisions on whether the site-specific biological response variables (caused by nutrients) are below levels that are necessary to ensure attainment of designated uses.

37. The existing New Hampshire narrative standard is based on the prevention of "cultural eutrophication."

38. Under New Hampshire law, "cultural eutrophication" is defined as "the human-induced addition of wastes containing nutrients to surface waters which results in excessive plant growth and/or a decrease in dissolved oxygen." Env-Wq 1702.15.

***New Hampshire's revised criteria***

39. Starting in 2005, EPA repeatedly requested that New Hampshire develop and adopt new numeric nutrient criteria for the Great Bay Estuary.

40. From 2005 through 2008, EPA repeatedly informed New Hampshire Department of Environmental Services ("NHDES") that the new numeric criteria must be adopted into rule.

41. On June 10, 2009, NHDES issued a draft document entitled "Numeric Nutrient Criteria for the Great Bay Estuary June 2009." *See* Ex. 1 ("2009 Criteria").

42. EPA Region I was closely involved in the derivation process of the 2009 Criteria document.

43. The 2009 Criteria document sets forth numeric water quality criteria for nitrogen, transparency (light attenuation), and chlorophyll-a for all tidal waters of the Great Bay Estuary as follows: the annual median TN concentration must be less than or equal to 0.30 mg/L; the annual median light attenuation coefficient (a measure of water clarity) must be less than or equal to 0.5 to 0.75 $m^{-1}$; a ninetieth percentile value for chlorophyll-a is not to exceed 10 ug/l.

44. Unlike the existing narrative nutrient criteria, compliance with the 2009 numeric nutrient criteria is not predicated on a demonstration that nutrients are causing excessive plant growth or that "excessive" plant growth caused an adverse impact on the designated beneficial uses.

45.  The 2009 Criteria document presumes that nitrogen is causing a substantial change algal growth in the system and that such growth is significantly impacting both transparency and dissolved oxygen.

46. The 2009 Criteria document *assumes* that a 0.3 mg/L TN instream objective is necessary to restore eelgrass via improved transparency.

47. EPA has been provided with sworn testimony from New Hampshire state officials confirming that the 2009 Criteria document set forth numeric thresholds for pollutants that had not been previously required under state law.

48. Similarly, EPA has been provided with sworn testimony from New Hampshire state officials confirming that the requirements set forth in the 2009 Criteria document "define, change, or establish a new level of protection."

49. EPA was also provided with sworn testimony from New Hampshire state officials admitting that the 2009 Criteria document modifies the "level of attainment" and results in changed impairment determinations to New Hampshire waterbodies, despite having the same instream conditions.

50. Finally, EPA was provided with sworn testimony from New Hampshire state officials confirming that the 2009 Criteria document eliminated the need to demonstrate a site-specific basis that nutrients were, in fact, causing an impairment.

51. EPA and New Hampshire have both acknowledged that the 2009 Criteria document was intended to replace the existing narrative criteria for nutrients.

52. EPA and New Hampshire had both planned on the formal adoption of the 2009 Criteria document.

53. New Hampshire deferred the formal adoption of the numeric criteria in the 2009 Criteria document at EPA's suggestion in mid-2009.

54. On or about 2009, EPA Regional Counsel indicated that the State should call the new numeric values in the 2009 Criteria document a "narrative translator" of "existing rules."

55. EPA's suggestion to call the 2009 Criteria document a "narrative translator" was made in an attempt to avoid the regulatory prerequisites applicable to the use of new numeric criteria (*i.e.,* formal state adoption and EPA approval).

56. By avoiding the water quality adoption process, EPA intended that the new numeric values in the 2009 Criteria document could be immediately used to declare waters nutrient impaired and generate the basis to impose stringent point source reduction requirements.

57. EPA's motivation for circumventing the WQSs adoption process was the threat of being sued by a local interest group – Conservation Law Foundation.

***EPA's unlawful implementation of the revised criteria***

58. In September of 2009, EPA approved, as part of its responsibility under Clean Water Act § 303(d), 33 U.S.C. § 1313(d), a New Hampshire list of the "threatened or impaired waters" for the Great Bay Estuary.

59. This list included numerous waterbodies that had never been identified as nutrient, transparency, and/or chlorophyll-a impaired, including, but not limited to, the following: NHEST 600030806-01 Squamscott River (Exeter); NHEST 600030904-02, 03 Great Bay PROHIB; NHEST 600030903-01, 02, 03 Bellamy River (Dover); NHEST 600030904-06-10, 11 Adams Point; NHEST 600030904-06-12-14, 15, 18, 19 Little Bay; NHEST 600031001-01, 02,

03 Upper Piscataqua River (Dover) (Rochester); NHEST 600031001-05, 08 Back Channel (Portsmouth); NHEST 600031001-11 Upper Portsmouth Harbor (Portsmouth).

60. NHDES informed EPA that these new 303(d) nutrient impairments were based expressly upon failure to meet the requirements set forth in the 2009 Criteria document.

61. In December 2009, EPA directed the state to apply the nitrogen criteria in the 2009 Criteria Document when evaluating the Section 303(d) impairment status of the waters in the Great Bay Estuary.

62. EPA recently proposed several NPDES permits (Exeter, NH, NPDES Permit No. NH0100871, Newmarket, NH, NPDES Permit No. NH0100196, and Dover, NH, NPDES Permit No. NH0101311) that were expressly based on attaining the nitrogen criteria contained in the 2009 Criteria document.

63. Each of these permits sought to achieve the 0.3 mg/L TN instream objective set forth in the 2009 Criteria document.

64. EPA has stated in various forums that the same criteria will be applied to making wastewater permitting decisions throughout the Great Bay watershed.

***Plaintiffs unable to comment on revised criteria***

65. The public never received formal opportunity for comment on the requirements of the 2009 criteria document.

66. Neither EPA nor New Hampshire ever undertook any rulemaking to adopt the requirements of the 2009 Criteria document.  In fact, EPA encouraged the state of New Hampshire to forego the rulemaking process.

67. In 2010 EPA conducted a peer review of the unadopted numeric standards in the 2009 Criteria document.

68. Plaintiffs' requests for public participation in the 2010 peer review were rejected by EPA.

69. If the rulemaking process had been initiated, the Plaintiffs would have had an opportunity to raise numerous scientific issues and either EPA or NHDES would have been required to defend the 2009 Criteria document on its merits.

70. EPA's failure to require such a process deprived the Plaintiffs of their right to have their legitimate legal and scientific concerns about the 2009 Criteria document addressed in the rulemaking process.

71. These concerns include, but are not limited to, the fact that:

a. EPA disregarded its own Scientific Advisory Board guidance documents (SAB Ecological Processes and Effects Committee, April 27, 2010 Final -Review of Empirical Approaches for Nutrient Criteria Derivation) which confirmed the methods used to derive the 2009 Criteria were not scientifically defensible;

b. EPA and DES excluded from the criteria derivation process extensive scientific evidence (including federally-funded studies) indicating no relationship between existing nitrogen levels, alleged changes in transparency and loss of the eelgrass resource existed in the Great Bay Estuary;

c. Disregarded the fact that significant eelgrass losses have occurred sporadically in the Great Bay Estuary over the last 70 years which all regulatory agencies admit cannot be linked to changing nitrogen levels;

d. Established chlorophyll 'a' criteria based on an equally indefensible conclusion that low dissolved oxygen ("DO") occurring in the tidal rivers was caused by algal growth when the data and detailed studies from the tidal rivers confirmed this was not the case.

## COUNT I

### VIOLATION OF 33 U.S.C. § 1365(a)(2):  EPA FAILED TO REVIEW NEW HAMPSHIRE'S REVISED WATER QUALITY STANDARDS UNDER THE CLEAN WATER ACT

72. The allegations of the preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

73. The Clean Water Act affirmatively requires EPA to review each and every new and/or revised state water quality standard for consistency with the Clean Water Act.

74. The 2009 Criteria document developed by New Hampshire, at EPA's request and with EPA's assistance, constituted a revision to New Hampshire's water quality standards.

75. The 2009 Criteria document created new numeric standards for nutrients, chlorophyll-a, and transparency for the Great Bay and associated tributaries.

76. Despite various state and federal admissions that the 2009 Criteria document constituted new and revised water quality standards, EPA has not, to date, reviewed the revised water quality standards for consistency with the Act.

77. EPA was required to review these newly enacted standards to determine whether they comply with the purposes of the Clean Water Act, before allowing regulatory decisions to be based on the new criteria.

78. Therefore, EPA's actions and omissions constitute a violation of the mandatory duties set forth in 33 U.S.C. § 1313(c) and implementing regulations.

## COUNT II

**VIOLATION OF 33 U.S.C. § 1365(a)(2):  EPA FAILED TO PROVIDE FOR,
ENCOURAGE, OR PROMOTE PUBLIC PARTICIPATION IN THE
DEVELOPMENT/REVISION OF NEW HAMPSHIRE'S WATER QUALITY
STANDARDS**

79. The allegations of the preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

80. The Clean Water Act affirmatively requires EPA to encourage and provide for public participation in the development and/or revision of all state water quality standards.

81. The 2009 Criteria document developed by New Hampshire, at EPA's request and with EPA's assistance, constituted a revision to New Hampshire's water quality standards.

82. With regard to the 2009 Criteria document, EPA failed to ensure that the new or revised standards were developed with adequate public participation.  To the contrary, EPA actively sought to prevent the public's input in the federal peer review of the 2009 Criteria document.

83. EPA's recommendation that NHDES implement 2009 Criteria document, without adhering to formal WQSs adoption procedures, impaired the Plaintiffs' public participation rights.

84. Therefore, EPA's actions and omissions constitute a violation of the mandatory duties set forth in 33 U.S.C. § 1251(e).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.  Grant declaratory judgment declaring that the *Numeric Nutrient Criteria for the Great Bay Estuary June 2009* contains new and revised water quality standards that must undergo the state and federal rulemaking procedures associated with such standards.

B.  Issue a writ in the nature of a mandamus requiring the defendants to comply with their mandatory duties under the Clean Water Act and determine if the new or revised water quality standards, as set forth in *Numeric Nutrient Criteria for the Great Bay Estuary June 2009*, meet the requirements of the Clean Water Act, including adherence to the formal state adoption process.

C.  Order EPA to, within 60 days of the Court's order, to determine whether the new or revised water quality standards meet the requirements of the Clean Water Act.

D.  Grant injunctive relief enjoining EPA from basing regulatory decisions on the *Numeric Nutrient Criteria for the Great Bay Estuary June 2009* document, including, but not limited to, 303(d) list determinations/approvals and NPDES permit effluent limitations.

E.   Award Plaintiffs litigation costs as provided under 33 U.S.C. § 1365(d), including

reasonable attorney and expert fees.

F.   Provide other relief as the Court deems proper.


Respectfully submitted,


_____
JOHN C. HALL, ESQ.
DC Bar No. 398172


_____
PHILIP D. ROSENMAN, ESQ.
DC Bar No. 975334


Hall & Associates
1620 I Street, NW, Suite 701
Washington, DC  20006
Telephone:  202-463-1166

*Attorneys for Plaintiffs*