UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITY OF DOVER, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,**<br><br>**Defendants.** | Civil Action No.  12-1994 (JDB) |

## MEMORANDUM OPINION

Plaintiffs, three New Hampshire cities, filed this action pursuant to the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(2). They allege that the Environmental Protection Agency ("EPA") failed to perform its nondiscretionary duties under the Act by not reviewing a document published by the New Hampshire Department of Environmental Services that proposed certain nutrient levels for the Great Bay Estuary, a tidal estuary located in eastern New Hampshire. The EPA has moved to dismiss the complaint, arguing that the Court has no jurisdiction because plaintiffs lack standing and that the complaint fails to state a claim because EPA did not violate any nondiscretionary duty. For the reasons explained below, the Court finds that it has jurisdiction, but agrees with EPA that plaintiffs have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

The Clean Water Act seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the Act, discharge of pollutants from certain sources, such as factory pipes, into U.S. waters is "normally permissible

1

only if made pursuant to the terms of a National Pollution Discharge Elimination System ('NPDES') permit." Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 349 (D.C. Cir. 1993); see also 33 U.S.C. §§ 1311(a), 1342. EPA is responsible for the NPDES permits for New Hampshire waters. See 33 U.S.C. § 1342(a), (b); see also Mot. to Dismiss [Docket Entry 8-1] at 6 & n.3 (Feb. 21, 2013). A permit must contain limitations necessary for the waterway receiving the pollutant to meet "water quality standards." 33 U.S.C. § 1311(b)(1)(C); see also 40 C.F.R. § 122.44(d)(1)(i).

Each State must also develop a list of waters not meeting applicable water quality standards, referred to as the "impaired waters" list, and the listed waters become subject to additional permit limitations. See 33 U.S.C. § 1313(d). States submit this list, which contains a priority ranking of the impaired waters, to the EPA for review and approval every two years. 40 C.F.R. § 130.7(d). In preparing the lists, States must "evaluate all existing and readily available water quality-related data and information." 40 C.F.R. § 130.7(b)(5).

While striving to improve water quality, the Act "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States" in reducing pollution and protecting their water resources. 33 U.S.C. § 1251(b). Consistently with this aim, water quality standards "are primarily the states' handiwork." Am. Paper Inst., 996 F.2d at 349. States must promulgate water quality standards and review existing standards every three years, holding public hearings to examine the governing water quality standards and assure that they "protect the public health or welfare, enhance the quality of water and serve the purposes" of the Act. 33 U.S.C. § 1313(c)(2)(A). Whenever a State adopts a new or revised water quality standard, it must submit the standard to EPA for review. Id. EPA then has sixty days to review and approve the new or revised standard, and ninety days to disapprove the standard and notify the state of

changes needed to satisfy the Act. 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21(a). If EPA disapproves a State's new or revised standard and the State fails to adopt required changes in a prescribed time, EPA must propose and promulgate Federal water quality standards to be effective within that State. 33 U.S.C. § 1313(c)(4).

Water quality standards "consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." 40 C.F.R. § 131.3(i). The water quality criteria can be "expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 C.F.R. § 131.3(b). Narrative criteria describe the desired levels qualitatively, without specifying particular pollutant concentrations. New Hampshire has a water quality standard with narrative nutrient criteria, which provides, for instance, that "Class B waters shall contain no phosphorus or nitrogen <u>in such concentrations that would impair</u> any existing or designated uses, unless naturally occurring." N.H. Code Admin. R. Ann. Env-Wq § 1703.14(b) (emphasis added).

Taking as true the allegations in the complaint, as the Court must at this stage, <u>see</u> <u>Oberwetter v. Hilliard</u>, 639 F.3d 545, 549 (D.C. Cir. 2011), the following facts form the basis for this action. Seeking to develop numeric water quality criteria for nutrients in the Great Bay Estuary, the New Hampshire Department of Environmental Services ("DES")—the New Hampshire agency charged with protecting its environment—conducted a site-specific water quality analysis. Working closely with the EPA, <u>see</u> Compl. [Docket Entry 1] ¶ 42 (Dec. 13, 2012), DES released a draft report summarizing the study for public comment, and received 135 comments, including by the plaintiffs in this case. See Ex. 1 to Compl. [Docket Entry 1-1] at 74 (Dec 13, 2012) ("2009 Document"). Then, in June 2009, it published the analysis, including responses to comments. <u>See</u> <u>id.</u> The 2009 Document described itself as a "report," which

"contain[ed] proposals for numeric nutrient criteria for different designated uses in the Great Bay Estuary." Id. at 2. The Document further stated that its "numeric criteria will first be used as interpretations of the water quality standards narrative criteria . . . . Later, DES will promulgate these values as water quality criteria in [New Hampshire Code of Administrative Rules, Chapter] Env-Wq 1700." Id. at 1.

DES subsequently decided not to promulgate the values in the 2009 Document as regulations in the New Hampshire Code of Administrative Rules, but it has continued to use the Document as a guide for interpreting the Code's narrative criteria. See Compl. ¶¶ 53-56, 66; see also 2009 Document at B-1. The Cities allege (and the Court takes as true for purposes of this motion) that EPA suggested that DES defer formal adoption of the Document to avoid the regulatory requirements for revising a water quality standard. See Compl. ¶ 55. EPA has directed DES to consider the 2009 Document in creating impaired water lists, and has relied on the Document in approving New Hampshire's expanded impaired waters list. Id. at ¶¶ 58-61. And EPA has used the nutrient levels proposed in the 2009 Document in its permitting decisions for the Great Bay watershed, issuing more restrictive permits as a result. Id. at ¶¶ 62-64.

In 2010, DES initiated a technical peer review of the 2009 Document's proposals and received a technical assessment from EPA's Nutrient Scientific Technical Exchange Partnership and Support, which found the numeric criteria clearly explained and well supported. See 2009 Document at C-1. In its review letter, EPA explained that its purpose "was to support the state by providing advice from national experts on how to improve the technical and scientific soundness of the document as a basis for future development of numeric nutrient water quality

4

criteria." Id. at C-2. Plaintiffs requested that the public be permitted to participate in the peer review, but the request was rejected by the EPA. See Compl. ¶ 68.

## STANDARD OF REVIEW

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993). Therefore, the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that may be drawn from the allegations of fact. See Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court—plaintiffs here—bears the burden of establishing that the Court has jurisdiction. See US Ecology, Inc. v. U.S. Dep't of the Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"). "'[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (omission in original) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)). Additionally, a court

may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, as long as it still accepts the factual allegations in the complaint as true. See Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). Although "detailed factual allegations" are not necessary, to provide the "grounds" of "entitle[ment] to relief," plaintiffs must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555-56 (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); accord Atherton v. D.C. Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).

## ANALYSIS

### I. Standing

Defendants argue that plaintiffs lack standing to bring this action because EPA's failure to review the 2009 Document did not cause their injury. "The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." Ass'n of Flight Attendants-CWA v. Dep't of Transp., 564 F.3d 462, 464 (D.C.

Cir. 2009) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Thus, to establish standing, a plaintiff must demonstrate a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984).

"Where plaintiffs allege injury resulting from violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005). Nonetheless, a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." See Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009).

Plaintiffs present their theory of standing supported by affidavits. Plaintiffs, three New Hampshire cities ("Cities"), operate wastewater treatment facilities that discharge into the Great Bay Estuary or upstream tributaries pursuant to NPDES permits. See, e.g., Green Aff. [Docket Entry 10-1] ¶ 3 (Mar. 20, 2013). They allege that the 2009 Document recommends overly high nutrient levels. Relying on the Document, DES has classified the receiving bodies of water as nutrient impaired, and EPA has approved this classification and added restrictions to the Cities' NPDES permits to attain the 2009 Document nutrient levels. See, e.g., id. ¶¶ 4-6. According to the affidavits, the Cities will have to spend millions of dollars to modify their wastewater treatment plants to meet these limitations. See, e.g., id. ¶ 7. The Cities further contend that they were legally entitled to comment on the key regulatory decisions involving the 2009 Document's validity before the EPA relied on it and that their procedural rights to have their concerns addressed were violated by the exclusion. See, e.g., id. ¶ 9.

Assuming—as the Court must for purposes of standing—that plaintiffs are correct on the merits, and that EPA had a nondiscretionary duty to review the 2009 Document and to allow Cities a greater opportunity to comment, EPA's failure to undertake the process caused the Cities' injury. "A plaintiff who alleges a deprivation of a procedural protection to which he is entitled"—as plaintiffs do here—"never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002); see also Lujan, 504 U.S. at 572 n.7 (noting that an individual who lives next to a site proposed for a federally licensed dam "has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered"). Accordingly, the Court need not find here that, had EPA conducted the allegedly required procedures, it would have disapproved of the Document and declined to use it. Plaintiffs have alleged that the 2009 Document, improperly viewed as valid because not subjected to review, has been used to harm their interests. They have hence established the loss of a procedural right (EPA review of the 2009 Document) that affects a "concrete interest" (their ability to discharge free of costly restrictions). See Summers, 555 U.S. at 496.

EPA's sole argument to the contrary begins with the premise that "a water quality standard must be a provision of State law," and reasons that DES's decision not to enact the Document into state law freed EPA from an obligation to review the standard, so DES's decision not to enact the Document (rather than any action by EPA) "is the cause of any injury alleged." Mot. to Dismiss at 17-18. This argument, however, fails to assume the merits in plaintiffs' favor. On plaintiffs' view of the law, EPA was required to review this document,

8

regardless of its promulgation into state law. Taking that assumption as true, EPA's decision not to follow the revised water quality standard procedures for the 2009 Document is the cause of the Cities' injury. The Cities' allegations, then, suffice to meet their burden, and the Court is satisfied that they have standing to bring this suit.

## II.     Duty to Review 2009 Document

The Court now turns to the merits. Plaintiffs bring this suit pursuant to the Clean Water Act's citizen suit provision, which allows a citizen to bring a suit against the EPA "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary." 33 U.S.C. § 1365(a)(2). The EPA has a nondiscretionary duty to review all new and revised water quality standards within a set time. See 33 U.S.C. § 1313(c)(2)(A), (c)(3) ("Whenever the State revises or adopts a new [water quality] standard, such revised or new standard shall be submitted to the Administrator," and the Administrator must approve the standard "within sixty days after the date of submission of the revised or new standard;" if, instead, the Administrator finds the standard inconsistent with the Act, "he shall not later than the ninetieth day after the date of submission of such standard notify the State and specify the changes to meet such requirements."). All agree that EPA did not conduct this review process for the 2009 Document.

The Cities allege that the 2009 Document was a revised water quality standard, and that EPA's failure to review and either adopt or reject it violated EPA's nondiscretionary duty. EPA responds that the Document was not a water quality standard at all, and so plaintiffs have failed to state a claim because EPA was not under any nondiscretionary duty to review it. See Sierra Club v. Jackson, 648 F.3d 848, 853-54 (D.C. Cir. 2011) (holding, for a citizen suit brought under a substantially identical provision of the Clean Air Act, that whether plaintiffs have

9

established a nondiscretionary duty to act by the EPA is a merits question under Rule 12(b)(6) rather than a subject-matter jurisdiction question under Rule 12(b)(1)).

The key issue, then, is whether the 2009 Document is a water quality standard. The Document is a report issued by a state agency that addresses nutrient levels, an aspect of water quality, and proposes a revision (or at least a supplement) to the governing water quality standard's criteria. See 2009 Document at 2 ("New Hampshire's Water Quality Standards currently contain only narrative criteria for nutrients to protect designated uses. . . . This report contains proposals for numeric nutrient criteria for different designated uses in the Great Bay Estuary . . . ."). The Document is not, however, a provision of New Hampshire law: plaintiffs agree that it was neither passed by the New Hampshire legislature nor promulgated by DES, the state agency. See Compl. ¶ 53 ("New Hampshire deferred the formal adoption of the numeric criteria in the 2009 Criteria document . . . ."); see also Green Aff. ¶ 4 (plaintiffs' affidavit asserting that the 2009 Document "has never been proposed for formal adoption into state law"). Plaintiffs allege (and the 2009 Document itself indicates) that DES initially intended to "promulgate these values as water quality criteria in [New Hampshire Code of Administrative Rules, Chapter] Env-Wq 1700" at a "[l]ater" date, see 2009 Document at 1, but the parties agree that this promulgation never took place. New Hampshire's water quality standard containing narrative nutrient criteria—the criteria the 2009 Document has since been used to interpret—by contrast, was promulgated by DES and is part of the New Hampshire Code of Administrative Rules. See N.H. Code Admin. R. Ann. Env-Wq § 1703.14.

The 2009 Document's lack of state law status turns out to be critical: EPA regulations define water quality standards as "provisions of State or Federal law." 40 C.F.R. § 131.3(i) ("Water quality standards are provisions of State or Federal law which consist of a designated

10

use or uses for the waters of the United States and water quality criteria for such waters based upon such uses."); see also 40 C.F.R. § 131.6(e) (requiring State to include in a water quality standard submitted for EPA review a "[c]ertification by the State Attorney General or other appropriate legal authority within the State that the water quality standards were duly adopted pursuant to State law"). Promulgation into law is, hence, one of the prerequisites to deeming a document a new or revised water quality standard. Plaintiffs do not here challenge this regulatory definition—nor could they because the regulation was promulgated in 1983, see Water Quality Standards Regulation, 48 Fed. Reg. 51400, 51406 (Nov. 8, 1983), and the time to challenge it has long since expired, see 33 U.S.C. § 1369(b)(1). Because the 2009 Document was never enacted into state law—unlike the provisions containing narrative nutrient criteria, which were promulgated by the New Hampshire agency and are part of its Code of Administrative Rules—it is not a water quality standard at all, and cannot be a revised water quality standard under the Clean Water Act. Accordingly, EPA's duty to review revised water quality standards was not triggered by the publication of the Document.[1]

Plaintiffs resist this conclusion, relying on an Eleventh Circuit case holding that a Florida regulation entitled "Impaired Waters Rule" would qualify as a revised water standard if its "actual effect" was to "change Florida's water quality standards." Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. EPA, 386 F.3d 1070, 1075, 1089 (11th Cir. 2004). But that case addressed a different question: how to determine whether a provision of state law that touches on water quality standards constitutes a revised water quality standard subject to EPA review. Because the rule at issue there—a regulation adopted by the state agency, id. at 1075—was

---

[1] This conclusion is apparent from the plain language of 40 C.F.R. § 131.3(i). If the regulation were ambiguous, however, EPA would warrant substantial deference in its interpretation of its own regulation, see Auer v. Robbins, 519 U.S. 452, 461 (1997), and the Cities have pointed to nothing that would establish that EPA's reading is "plainly erroneous or inconsistent with the regulation," id. (internal quotation marks omitted).

undisputedly a provision of state law, the Eleventh Circuit case cannot stand for the proposition that the Cities need in order to prevail, namely that a document not enacted into state law can nonetheless constitute a water quality standard. Put otherwise, if the 2009 Document were promulgated into state law, the Court would (if persuaded by the Eleventh Circuit's reasoning) look to its actual effect to determine whether it revised New Hampshire's prior water quality standard. But the Court need not reach that question in this case. The 2009 Document was not enacted into law and so, under unchallenged regulations, cannot be a water quality standard regardless of its practical effect.[2]

The Cities next contend that requiring adoption into state law "would create the perverse incentive for states to never formally adopt [water quality standard] revisions so they could circumvent federal review requirements as well as all federal public participation requirements." Pls.' Opp'n to Mot. to Dismiss [Docket Entry 10] at 13 n.4 (Mar. 20, 2013) ("Pls.' Opp'n"). As an initial matter, this is an argument against defining a water quality standard as a provision of federal or state law. But the requirement of state law adoption is spelled out in an unchallenged regulation, and the Court can hardly ignore the requirement because of perverse incentives it may create. In any event, plaintiffs' fears about opportunities to circumvent the Clean Water Act procedures are misplaced. First, the Clean Water Act affirmatively requires adoption of initial water quality standards as well as periodic review (and, if needed, revision) of those standards. 33 U.S.C § 1313(a)(2), (a)(3), (b), (c)(1). Second, a document published by an agency operates differently from a water quality standard, which has been promulgated into law.

---

[2] Similarly, the Cities' argument that the 2009 Document is subject to EPA review because it is a narrative translator—a policy affecting the implementation of water quality standards—is a nonstarter. If such an interpretive policy is promulgated into state law, EPA regulations establish that the policy becomes subject to review. See 40 C.F.R. § 131.13 ("States may, at their discretion, include in their State standards, policies generally affecting their application and implementation, such as mixing zones, low flows and variances. Such policies are subject to EPA review and approval." (emphasis added)). In other words, status as a narrative translator does not preclude review. But the cited regulations nowhere provide that a policy not included in a water quality standard, let alone one not even promulgated into law, is subject to review because it is labeled a narrative translator.

Water quality standards carry binding consequences, automatically limiting the permits that may be issued. See Am. Paper Inst., 996 F.2d at 350 (the Act "requires all NPDES permits for point sources to incorporate discharge limitations necessary to satisfy [the water quality] standard"). The 2009 Document may have effects detrimental to the Cities' interest, but it has these effects in the same way as a scientific report arguing for a lower cap on a pollutant or a higher requirement for a nutrient: it can influence subsequent regulatory action only by persuasion, and the Document's validity and persuasiveness can be challenged in the context of that decision.[3] The Cities' approach, by contrast, would require any document that a state agency may later consider in interpreting its water standards to be reviewed by the EPA. But there are countless such documents. See, e.g., 40 C.F.R. § 130.7(b)(5) (requiring States to "evaluate all existing and readily available water quality-related data and information" in creating impaired water lists). If EPA had to be aware of every one, and had to subject it to a review process—and, if it disagreed with its reasoning, promulgate its own alternative, see 33 U.S.C. § 1313(c)(4)—havoc would result.[4] The Clean Water Act and implementing regulations require no such thing, subjecting only provisions of state law to the review process. See 40 C.F.R. § 131.3(i); see also 40 C.F.R. § 131.21(a) (EPA's clock for acting on a State submission begins when "the State submits its officially adopted revisions" to water quality standards (emphasis added)). It is difficult to fathom how a contrary requirement would function, and it is

---

[3] The Cities appear to have done just that, appealing the NPDES permits to the Environmental Appeals Board and challenging the use of the 2009 Document in that appeal. See, e.g., Pet'n for Review at 46, In re Town of Newmarket, No. NPDES 12-05 (Dec. 14, 2012) (arguing that "EPA is illegally applying an unadopted, numeric criteri[on] violating applicable Federal law, in deciding that a 0.3mg/L TN criteria must be met throughout the Great Bay Estuary to protect eelgrass"), available at http://go.usa.gov/4yYR.

[4] Indeed, the havoc would likely be incompatible with a "clear-cut" nondiscretionary duty to review that is actionable under section 1365(a)(2), the citizen suit provision that forms the basis of plaintiffs' suit. See Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C. Cir. 1987) (holding under a nearly identical provision of the Clean Air Act that a nondiscretionary duty supporting a citizen suit must be "nondiscretionary, i.e. clear-cut").

hence entirely unsurprising—and dispositive here—that federal regulations interpreting the Act require a water quality standard to be a provision of law.

The Cities next argue that EPA's review obligation encompasses water quality standards that are promulgated illegally rather than "pursuant to State procedures." Pls.' Opp'n at 16. To be sure, in "review[ing] . . . State-adopted water quality standards," EPA must consider "[w]hether the State has followed its legal procedures for revising or adopting standards." 40 C.F.R. § 131.5(a). But as the text of this provision makes clear, the relevant procedures are not those for promulgating a provision into state law, but the procedures for "revising or adopting standards," id. (emphasis added), such as notifying the EPA of the change. Indeed, the Eleventh Circuit case plaintiffs cite illustrates that 40 C.F.R. § 131.5(a) addresses the special procedures that states have for laws that amend their water quality standards, rather than state law requirements for promulgating a law. It notes that a Florida agency's failure to "follow the mandated procedures to amend its water quality standards" in promulgating a regulation that was undisputedly part of the State's Administrative Code could give the EPA a reason to disapprove the water quality standard. See Fla. Pub. Interest Research Grp. Citizen Lobby, 386 F.3d at 1081, 1089. Plaintiffs have thus provided no support for the proposition that promulgation into law is itself a "procedure" that has no effect on whether a document is a water quality standard; nor could they, for the proposition contradicts other EPA regulations for the reasons already discussed above. See 40 C.F.R. § 131.3(i) (defining water quality standard as provision of state law); 40 C.F.R. § 131.6(e) (requiring State to include certification "the water quality standards were duly adopted pursuant to State law" when submitting a water quality standard for EPA review). The decision not to promulgate the 2009 Document into law

hence is not an "illegal procedure" for amending a water quality standard, but something that precludes the report from being a revised water quality standard in the first instance.[5]

The 2009 Document is a report by an agency without binding effect, rather than a statute or a regulation. The Cities' real argument, then, is that the EPA and DES have improperly given the report the force of law in subsequent decisions. Perhaps EPA and DES did so, perhaps not. But that challenge must be raised in the context of those subsequent decisions because EPA did not have a nondiscretionary duty to review the 2009 Document.

### III.  Duty to Encourage Public Participation

Plaintiffs also contend that EPA has violated a nondiscretionary duty to encourage public participation. As a source of that duty, they rely on 33 U.S.C. § 1251(e), which provides,

> Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

EPA has developed regulations to interpret and implement this section, providing for general public participation requirements, see 40 C.F.R. pt. 25, public participation requirements for permit decision-making, see 40 C.F.R. §§ 124.10-.14, public participation requirements related to lists of impaired waters, see 40 C.F.R. § 130.7(d)(2), and public participation requirements for States and the EPA in the water quality standards revision process, see 40 C.F.R. §§ 131.20-

---

[5] Plaintiffs' reliance on the Eight Circuit decision in Iowa League of Cities v. EPA, 711 F.3d 844 (8th Cir. 2013), is also misplaced. That decision interpreted an entirely different provision of the Clean Water Act that gives a court of appeals jurisdiction to review action by EPA "in approving or promulgating any effluent limitation" under the Clean Water Act and held that the word "promulgating" should be interpreted broadly "to include agency actions that are 'functionally similar' to a formal promulgation." Id. at 861-62 (internal quotation marks omitted). The word "promulgating" is not even at issue in this case; rather, the relevant requirement is whether the 2009 Document is a "provision[] of State . . . law." 40 C.F.R. § 131.3(i). In any case, the Eighth Circuit's broad definition would not capture the 2009 Document because the "touchstone" of its analysis was whether the agency action was "binding on regulated entities or the agency," Iowa League of Cities, 711 F.3d at 862, and the 2009 Document is not itself binding on Cities or on anyone else.

.22. The Cities nonetheless argue that EPA has violated a nondiscretionary duty by declining to encourage public participation as to the 2009 Document in two ways: by recommending that New Hampshire use the 2009 Document without adopting it as state law and by precluding plaintiffs from participating in a federally-funded peer review of the Document that EPA conducted at New Hampshire's request.

A nondiscretionary duty must be "clear-cut" in addition to being mandatory. Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C. Cir. 1987) (holding that non-readily ascertainable requirement "impose[s] merely a 'general duty'" that is not actionable under the Clean Air Act's citizen suit provision). The D.C. Circuit has recognized that a statute's use of the word "shall" does not create a nondiscretionary duty where the statute provides no guidance as to what action must be taken. See Jackson, 648 F.3d at 856 ("Congress's mandate to the Administrator is that she shall 'take such measures, including issuance of an order, or seeking injunctive relief, as necessary . . . .' There is no guidance to the Administrator or to a reviewing court as to what action is 'necessary,'" so the Administrator "had sufficient discretion to render her decision not to act nonjusticiable."); see also Envtl. Def. Fund v. Thomas, 870 F.2d 892, 899 (2d Cir. 1989) ("the district court has jurisdiction, under Section 304 [of the Clean Air Act], to compel the Administrator to perform purely ministerial acts, not to order the Administrator to make particular judgmental decisions"). Here, the statute offers no guidance whatsoever for assessing EPA's role—beyond promulgating regulations—in encouraging public comment. Must the EPA, for instance, open to public comment every new scientific study or every communication between it and a state agency? Must it advise States to pass into law any such report or guidance document in order to bring it within review procedures?

Although the EPA must act to promote public participation, it has vast discretion as to the <u>methods</u> it uses to promote participation, and "a court would have no meaningful standard against which to judge the agency's exercise of discretion." <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985); <u>cf.</u> <u>Ass'n of Irritated Residents v. EPA</u>, 494 F.3d 1027, 1033 (D.C. Cir. 2007) ("None of the statutes' enforcement provisions give any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another."). The inferences the Court would have to draw, then, are even more attenuated than inferring a timetable from a statutory scheme, <u>see</u> <u>Thomas</u>, 828 F.2d at 791 ("it is highly improbable that a deadline will ever be nondiscretionary, i.e. clear-cut, if it exists only by reason of an inference drawn from the overall statutory framework"), or determining what enforcement action EPA should take, <u>see</u> <u>Jackson</u>, 648 F.3d at 856.

The lack of a meaningful standard is particularly apparent given the Cities' specific request here. The Cities would have the Court find that EPA's general duty to encourage public participation required EPA to encourage a State to promulgate a report into law in order to trigger a review process in addition to the substantial public comment process the State did undertake, <u>see</u> 2009 Document at 74 (describing public comment process for the draft Document, in which the Cities participated), and to invite every interested party to participate every time EPA conducts its own peer review of a state report. The Cities would, in essence, have the Court find a duty by EPA to increase public participation with each decision it makes. EPA, instead, has developed detailed regulations providing for extensive public participation without requiring public hearings or public comment on every document related to water quality. The Cities have not shown how this balance violates any "categorical mandate"

imposed by the Clean Water Act. See Thomas, 828 F.2d at 791 (alterations and internal quotation marks omitted).

While it is clear from the provision's use of the word "shall" that the EPA is required to do something, it is not clear here what that something is. Accordingly, there is no nondiscretionary duty for EPA to undertake any specific action to promote public participation, aside from the one expressly mentioned in the text—promulgating regulations—an action that EPA has undisputedly carried out here. The violation plaintiffs assert is hence not actionable under the Clean Water Act's citizen suit provision, and this Count, too, must be dismissed.

## CONCLUSION

For these reasons, defendant's motion to dismiss will be granted. A separate order will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 30, 2013