# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**THE CITY OF DOVER, et al.,**

    **Plaintiffs,**

       **v.**

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,**

    **Defendants.**

**Civil Action No. 12-1994 (JDB)**

---

## MEMORANDUM OPINION

Plaintiffs, three New Hampshire cities, filed this action pursuant to the citizen-suit provision of the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1365(a)(2). After some initial stumbles, they filed an amended complaint alleging that the defendants, including (and jointly referred to as) the Environmental Protection Agency ("EPA"), violated the Administrative Procedure Act, 5 U.S.C. § 701 et seq., in approving New Hampshire's impaired waters list under the CWA. Now before the Court is [32] defendants' motion to dismiss [29] plaintiffs' amended complaint for lack of subject-matter jurisdiction. For the reasons explained below, the Court will grant the motion.

## BACKGROUND

Last year, this Court granted defendants' motion to dismiss plaintiffs' complaint, dismissing it with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). July 30, 2013 Order [ECF No. 18]. Plaintiffs own and operate waste treatment plants that discharge into the Great Bay Estuary, and they challenged several regulatory decisions made by EPA that they believe affected their ability to continue to do so. In rejecting plaintiffs'

arguments that EPA acted improperly, the Court noted in dicta that plaintiffs might have raised their challenge to EPA's actions in the context of an APA challenge to certain decisions that EPA made. <u>See</u> July 30, 2013 Mem. Op. [ECF No. 17] ("Mem. Op.") 15 (noting that "plaintiffs' real argument . . . is that the EPA . . . [has] improperly given [a certain report] the force of law in subsequent decisions" and that plaintiffs' "challenge must be raised in the context of those subsequent decisions"). Plaintiffs, seeing this language as an invitation, moved under Fed. R. Civ. P. 59(e) and 15(a) to reopen the judgment and to amend their complaint to assert an APA claim, and the Court granted that motion. <u>See</u> Nov. 15, 2013 Mem. Op. & Order [ECF No. 27]. After plaintiffs amended their complaint, EPA again moved to dismiss the complaint. The Court will grant that motion because, in effect, plaintiffs still have not chosen the proper decisions to challenge.

The Court is mindful that, assuming plaintiffs' allegations are true, they may someday be forced to expend significant resources to comply with EPA's directives. That day is not today, however, which is the central flaw in their case. The regulatory decisions that plaintiffs challenge have not yet caused them harm, and indeed whether plaintiffs will be harmed is still uncertain. They ask the Court to tell EPA that it acted improperly when listing the Great Bay Estuary waters as impaired, or polluted. But EPA's action does not mean plaintiffs have to change their behavior today. And even if EPA had never listed those waters as impaired, plaintiffs might have to change their behavior anyway because of a separate permitting process. So even if plaintiffs are right that EPA acted improperly, taking the waters off the list will not help them. Down the road, plaintiffs may receive permits that do force them to spend money, <u>whether or not</u> the waters are listed as impaired. When they do, by statute, plaintiffs will have to challenge those permits in another forum. <u>See</u> 33 U.S.C. § 1369(b). This Court also cannot review actions that

EPA and New Hampshire have yet to take, such as the issuance of a total maximum daily load for the Great Bay Estuary and the issuance of a new general stormwater permit. Moreover, plaintiffs do not have a right to participate in EPA's listing decision, so when EPA excluded them from that decisionmaking process, plaintiffs lost nothing to which they were entitled. Plaintiffs may yet have their day in court, but they have simply picked the wrong day.

## STANDARD OF REVIEW

EPA asserts two grounds for dismissal, arguing that plaintiffs do not have standing to bring their claims and that their claims are not ripe. See Defs.' Mem. in Supp. of Mot. to Dismiss [ECF No. 32-1] ("Defs.' Mot.") 1. These are challenges to this Court's subject-matter jurisdiction and therefore will be evaluated under Fed. R. Civ. P. 12(b)(1). See Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (stating that "the defect of standing is a defect in subject matter jurisdiction"). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord. Unit, 507 U.S. 163, 164 (1993). Therefore, the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that reasonably may be drawn from the allegations of fact. See Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). The Court need not, however, accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Although courts examining a Rule 12(b)(1) motion to dismiss—such as for lack of standing or ripeness—will "construe the complaint in favor of the complaining party," see Warth

v. Seldin, 422 U.S. 490, 501 (1975), the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim," Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 (2d ed. 1987)). Because the elements necessary to establish jurisdiction are "not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof; i.e., with the manner and degree of evidence required at successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Thus, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case, so long as the court accepts the factual allegations in the complaint as true. See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997).

## DISCUSSION

### I. REGULATORY BACKGROUND

#### a. Water Standards Under The Clean Water Act

Generally, the Clean Water Act uses two different types of standards "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters": technology-based standards and water-quality standards. 33 U.S.C. § 1251(a). Technology-based standards set a minimum level of treatment that must be performed by those who discharge pollutants into waters. That level is predetermined by EPA to be both technologically available and economically achievable. Id. § 1311(b)(1)(B) (requiring certain standards for publicly owned treatment works). In contrast, water quality standards depend on the purpose for which a

particular body of water is used. 40 C.F.R. § 131.3(i). A body of water designated as a water supply, for example, may have a different standard from a body of water designated for watercraft navigation. States are primarily responsible for creating and revising water quality standards, but they must also submit those standards to EPA for approval. Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 349 (D.C. Cir. 1993) (water quality standards "are primarily the states' handiwork"); 33 U.S.C. § 1251(b) (stating Congressional policy to "recognize, preserve, and protect the primary responsibilities and rights of States" in reducing pollution and protecting their water resources); see also 33 U.S.C. § 1313(c)(2)(A) (states must submit new or revised standards to EPA for review); 33 U.S.C. § 1313(c)(3) (EPA must approve or disapprove standards and notify state of proposed changes); 40 C.F.R. § 131.21(a) (same); 33 U.S.C. § 1313(c)(4) (if state fails to adopt changes, EPA must promulgate standards).

Water quality standards can be expressed as numerical criteria or as narrative criteria. 40 C.F.R. § 131.3(b). Numerical criteria define specific levels or concentrations of particular pollutants, while narrative criteria describe the body of water or levels of pollutants in qualitative terms. Whether expressed numerically or narratively, standards describe the maximum amount of pollutants that waters can contain before their designated use is considered to be impaired. For example, a water quality standard relating to a water supply might set a level of chlorine in parts per billion ("PPB"). Waters that contain levels of chlorine higher than, e.g., 20 PPB would be considered, under that water quality standard, impaired for use as a water supply. Narrative standards are less specific: for example, one might provide that bodies of water designated for use as water supplies shall not contain chlorine in concentrations that would impair their use as water supplies. Several parts of the Act's regulatory scheme call for EPA or a state to translate narrative criteria into numerical standards for some purpose.

### b.      National Pollution Discharge Elimination System Permits

Under the Act, certain sources (such as plaintiffs' waste treatment plants) may discharge pollutants only under the terms of a National Pollution Discharge Elimination System permit ("NPDES permit" or simply "permit"), which may be administered by a state or by EPA. See Am. Paper Inst., 996 F.2d at 349; see also 33 U.S.C. §§ 1311(a), 1342.

Permits are waterway- and discharger-specific. Permits limit those who discharge pollutants into particular waterways by limiting the amount of a particular pollutant a permitholder may release (often referred to as "effluent limits"). Those limits are set with reference to the waterway into which the permitholder is releasing pollutants. If the applicable water quality standard for a particular waterway is strict, a permitholder likely will face strict limits on how much of a particular pollutant it can release into that waterway.

Permits contain both technology-based limits and water-quality-based limits. 33 U.S.C. §§ 1311(b), 1314(b). Technology-based limits essentially act as a floor: they describe a minimum level of treatment a permitholder must perform. Permitholders must meet both technology-based limits and water-quality-based limits. If technology-based limits are not strict enough to ensure that a state's water quality standards will be met, then a permit must contain additional limits regardless of technological or financial concerns. 40 C.F.R. § 122.44(d)(1); see 33 U.S.C. § 1311(b)(1)(C). EPA's regulations provide a detailed process for determining water-quality-based limits, starting with the identification of pollutants of concern. See 40 C.F.R. § 122.44(d)(1). Thus, permits contain both technology-based limits and (usually more stringent) water-quality-based limits.

### c. The 303(d) List

NPDES permits are but one piece of the Act's larger scheme designed to protect the nation's waters. Another piece of that scheme is provided in 33 U.S.C. § 1313(d) (section 303(d) of the Act). Under that provision, every two years, each state must identify and list waters for which technology-based limits are not strict enough to achieve or maintain state water quality standards. 40 C.F.R. § 130.7; see 33 U.S.C. § 1313(d)(2). In creating its section 303(d) list, a state must "assemble and evaluate all existing and readily available water quality-related data and information." 40 C.F.R. § 130.7(b)(5). EPA must then approve or disapprove of that list, referred to as the "impaired waters list" or the "303(d) list." 33 U.S.C. § 1313(d)(2) (EPA must establish its own list if it disapproves of state's list). To sum up, waters are included on the 303(d) list if technology-based standards alone are not enough to achieve state water quality standards, while permits must contain limits sufficient to achieve state water quality standards.

### d. Total Maximum Daily Loads

For each body of water on the 303(d) list, a state must establish a "total maximum daily load" ("TMDL") for each pollutant that is "preventing or [is] expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii); see 33 U.S.C. § 1313(d)(1)(C). Essentially, a TMDL is a "pollution budget" for each body of water. It sets a cap on the total amount of, say, chlorine that can be added to a body of water from all sources per day before it will no longer meet state water quality standards. As with the 303(d) list, EPA must approve or disapprove of TMDLs established for waters on the 303(d) list. 33 U.S.C. § 1313(d)(2) (EPA must establish its own TMDLs if it disapproves of state's TMDLs).

But a TMDL "does not, by itself, prohibit any conduct or require any actions. Instead, each TMDL represents a goal that may be implemented by adjusting pollutant discharge

requirements in individual NPDES permits or establishing nonpoint source controls."[1] City of

Arcadia v. EPA, 265 F. Supp. 2d 1142, 1144 (N.D. Cal. 2003). Once a TMDL is established,

EPA must allocate pollutant levels between permitholders and nonpoint sources discharging into

that body of water. 40 C.F.R. § 122.44(d)(1)(vii)(B). So, for example, if a TMDL for a water

supply is 10 grams per day ("g/day")[2] of chlorine, nonpoint sources account for 2 g/day, and four

point sources have permits to discharge into the water supply, the sum of those four dischargers'

water-quality-based limits will not exceed 8 g/day. But the water-quality-based limits in permits

will not reflect TMDLs until those TMDLs are established; until then, EPA bases water-quality-

based limits in permits only on a "reasonable potential" determination. See infra Part II.a.2.

 **e.**  **Great Bay Estuary Waters**

   Taking as true the allegations in the complaint, as the Court must at this stage, see

Oberwetter v. Hilliard, 639 F.3d 545, 549 (D.C. Cir. 2011), the following facts form the basis for

this action. New Hampshire has narrative water quality criteria, and EPA administers the NPDES

permits for New Hampshire waters. See 33 U.S.C. § 1342(a), (b); see also Defs.' Reply in Supp.

of Mot. to Dismiss [ECF No. 39] ("Defs.' Reply") 1 n.1. In relevant part, New Hampshire's

water quality standards provide that certain "waters shall contain no . . . nitrogen in such

concentrations that would impair any existing or designated uses, unless naturally occurring";

that "[e]xisting discharges containing . . . nitrogen which encourage cultural eutrophication[3]

shall be treated to remove . . . nitrogen to ensure attainment and maintenance of water quality

---

[1] Nonpoint sources are nondiscrete sources such as agricultural runoff, as opposed to point sources such as factories.

[2] A TMDL may be expressed in different units of measurement than state water quality standards. State water quality standards usually express how much of a particular pollutant that a representative sample from the body of water can contain (so, how much chlorine in parts per billion). But a TMDL expresses how much of that pollutant, in real terms, can be added to the body of water per day (so, how much chlorine in grams).

[3] "Cultural eutrophication" is defined as "the human-induced addition of wastes containing nutrients to surface waters which results in excessive plant growth and/or a decrease in dissolved oxygen." N.H. Code Admin. R. Ann. Env-Wq §§ 1702.15.

standards"; and that "[t]here shall be no new or increased discharge(s) containing . . . nitrogen to tributaries of lakes or ponds that would contribute to cultural eutrophication or growth of weeds or algae in such lakes and ponds." N.H. Code Admin. R. Ann. Env-Wq §§ 1703.14 (b), (c), (e).

After conducting a site-specific water quality analysis of the Great Bay Estuary waters (the waters at issue here), working closely with EPA, and receiving public comments, the New Hampshire Department of Environmental Services ("NHDES") published a report ("the 2009 Document") "contain[ing] proposals for numeric nutrient criteria for different designated uses in the Great Bay Estuary." Ex. 1 to Compl. [ECF No. 1-1] 74 ("2009 Document"). Put differently, the 2009 Document contains proposed translations of New Hampshire's narrative standards into numeric values. As explained in the Court's previous opinion, however, the 2009 Document is not itself a state water quality standard. Mem. Op. at 10.

Plaintiffs, who operate waste treatment facilities that discharge into the Great Bay Estuary under NPDES permits, think that the maximum nitrogen levels proposed in the 2009 Document are too low. Thus, when NHDES and EPA allegedly relied on that document to interpret New Hampshire's narrative water quality criteria, and placed the Great Bay Estuary waters on the impaired waters list because it had nitrogen levels above those maximum levels, plaintiffs took issue.[4] In other words, plaintiffs argue that the Great Bay Estuary waters should not be on the impaired waters list because EPA set maximum nitrogen levels too low when interpreting New Hampshire's narrative water quality criteria in creating and approving the impaired waters list. In plaintiffs' view, the inclusion of the Great Bay Estuary waters on the impaired waters list is the "linchpin for a cascade [of] deleterious regulatory actions" adverse to

---

[4] New Hampshire submitted impaired water lists to EPA in 2008 and 2010, and EPA approved the lists in 2009 and 2011, respectively. For the purposes of this opinion, the Court refers to EPA's two approvals as a single decision.

them. Pls.' Opp'n to Defs.' Mot. to Dismiss [ECF No. 36] ("Pls.' Opp'n") 21. Hence, plaintiffs argue that by relying on the 2009 Document in proposing and approving the 2009 and 2011 impaired waters lists, EPA acted arbitrarily, capriciously, or otherwise not in accordance with law.

EPA counters that the presence of the Great Bay Estuary waters on the impaired waters list did not, and will not, cause the effects of which plaintiffs complain. Accordingly, EPA contends that plaintiffs have no standing to challenge the impaired waters listing determination, arguing that plaintiffs cannot demonstrate any injury caused by the 303(d) listing decision that is redressable by removing the waters from the list. EPA also argues that the case is not ripe for this Court's review.

## II.    STANDING

Standing is a "threshold question in every federal case." Warth, 422 U.S. at 498. Article III of the U.S. Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies,'" Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III" and which are thus "'appropriately resolved through the judicial process,'" Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth, 422 U.S. at 498. To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact" which is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed

by a favorable decision." Lujan, 504 U.S. at 560-61 (internal quotation marks and citations omitted). Plaintiffs assert injuries in four areas: new NPDES permits with restrictive nitrogen limits, restrictions on the expansion of their facilities, increased costs due to a general stormwater permit, and a due process injury. None will support Article III standing.

### a. Plaintiffs Do Not Have Standing Based On Their NPDES Permits

#### 1. Plaintiffs have not alleged a cognizable injury under Article III

Plaintiffs assert that, "[a]s a result of EPA's [approval of Great Bay Estuary waters being included on the 303(d) list], the Cities received (or have been expressly informed that they will receive) NPDES permits . . . that, for the first time, will contain extremely restrictive effluent [nitrogen] limitations." Pls.' Opp'n at 1-2. That hedge (that the Cities "have been expressly informed that they will receive" restrictive permits) is important: none of the plaintiffs have actually been issued a final NPDES permit with the nitrogen limits to which plaintiffs take exception. Plaintiffs try to brush off this critical fact by noting that "two Great Bay wastewater treatment facilities have already been issued final NPDES permits that impose these extremely restrictive [nitrogen] limitations." Id. at 2 n.1. But neither of those facilities is operated by plaintiffs. Instead, they are owned and operated by two cities that are not plaintiffs in this action, Exeter and Newmarket. Id. at 2 n.1, 6. Plaintiffs go on to note that "[t]he City of Dover [an actual plaintiff] has been issued a draft permit with such limitations, and the Cit[ies] of [Rochester][5] and Portsmouth have been informed that they too will receive such limitations in their next permit." Id. (emphasis added). In other words, one plaintiff in this action has been issued a proposed permit with restrictive nitrogen limits, and the other two plaintiffs have allegedly been told that they will receive similarly restrictive nitrogen limits in permits that have yet to be

---

[5] In their brief, plaintiffs write that Exeter has been informed that it will receive nitrogen limits in its next permit, but close review of the facts indicates that plaintiffs meant that Rochester, a plaintiff, has been so informed.

proposed. Id. at 6, 7. Whether EPA will issue plaintiffs final permits with the same restrictive[6]

nitrogen limits remains uncertain. But "[a]llegations of possible future injury do not satisfy the

requirements of Art[icle] III. A threatened injury must be 'certainly impending' to constitute

injury in fact." Whitmore, 495 U.S. at 158 (internal quotation marks omitted). Hence, because

plaintiffs have not yet been issued permits with the nitrogen limits of which they complain—and

because it is uncertain whether the permits they are issued in the future will contain those

limits—they have not alleged a cognizable Article III injury.

2. Even if plaintiffs have alleged a cognizable injury, they cannot show causation

Plaintiffs contend that, by approving the inclusion of the Great Bay Estuary waters on the

303(d) list, EPA immediately caused them significant injury. In plaintiffs' view, once EPA

included those waters on the impaired list, it was required by its own regulations to issue

plaintiffs permits with more restrictive nitrogen limits. Id. at 11 ("According to EPA's own

regulations, these permits must require pollutant reductions if the permittee discharges the

pollutant of concern . . . to the waterbody identified as impaired on the 303(d) list.") (emphasis

added); id. at 13 ("presence on the [303(d)] list guarantees" that a permit will contain a limit)

(emphasis added). Plaintiffs believe that this requirement kicked in the moment that EPA put the

waters on the impaired list. Id. at 10 (citing "direct and immediate impact" of EPA's 303(d)

approvals on permitting process).

To refresh, waters are included on the 303(d) list if the technology-based limits required

by other sections of the CWA (§§ 1311(b)(1)(A) and (b)(1)(B)) "are not stringent enough to

implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A).

---

[6] Whether the nitrogen limits are, in fact, restrictive is not for this Court to decide; any reference in this opinion to a "restrictive" nitrogen limit is shorthand for plaintiffs' characterization of that limit.

NPDES permits, meanwhile, must contain water-quality-based standards sufficient to "[a]chieve water quality standards established under [33 U.S.C. §1313], including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1). Specifically, those standards must control all pollutants that "are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." Id. § 122.44(d)(1)(i).

If EPA[7] concludes that a particular pollutant meets this test, referred to as the "reasonable potential determination," it must then set the level at which the permitholder may release the pollutant. Id. § 122.44(d)(1)(iii). That level, in turn, also depends on the state's water quality standards. New Hampshire has narrative water quality criteria, so EPA first has to interpret the narrative criteria and translate them into numerical criteria. Id. § 122.44(d)(1)(vi); Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 990-91 (D.C. Cir. 1997). In interpreting New Hampshire's narrative criteria, EPA must establish limits that "will attain and maintain applicable narrative water quality criteria and will fully protect the designated use," or establish limits on a case-by-case basis using published EPA criteria. 40 C.F.R. § 122.44(d)(1)(vi).[8]

Plaintiffs assert that the 303(d) list determination and NPDES permitting decisions are inextricably intertwined, so that "if a waterbody has already been identified as impaired on the 303(d) list as not meeting 'applicable standards,' the [excursion above the state water quality standard] is already established and the permit writer simply calculates and imposes an effluent limitation." Pls.' Opp'n at 4. In effect, plaintiffs conceive of 303(d) listing as a regulatory shortcut: they believe it conclusively establishes that a pollutant is a concern under the

_____

[7] Even though EPA is not the permitting authority for all states—though it is for New Hampshire—for ease of reference this opinion refers to EPA as the permitting authority.

[8] EPA has a third option: to establish limits on an indicator parameter for the pollutant, provided certain conditions, but the parties agree that this option is not relevant here. See id. § 122.44(d)(1)(vi)(C).

reasonable potential determination, and that EPA must therefore calculate and establish limits for that pollutant.

But this shortcut does not exist. The permitting regulation explains that, "[w]hen determining whether a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative or numeric criteria within a State water quality standard, [EPA] shall use procedures which account for" several different factors, none of which is 303(d) listing. 40 C.F.R. § 122.44(d)(1)(ii) (EPA must account for existing controls on sources of pollution, variability of the pollutant in the discharge, sensitivity of the species to toxicity testing, and dilution of effluent in water). Simply put, the 303(d) listing determination and the section 122.44(d)(1)(i) determination are wholly separate. Hence, to make the 303(d) list determination, EPA asks whether a particular body of water is polluted; to make the section 122.44(d)(1)(i) reasonable potential determination, EPA asks whether a particular source is discharging too much of a pollutant.

Plaintiffs themselves pithily reveal their causation problems when they write that "without the 303(d) decision approvals, EPA could not impose [nitrogen] limitations under 40 C.F.R. § 122.44(d), <u>unless it independently determined that the Cities' nitrogen discharges were causing or contributing to violations of the state's narrative criteria (the true "applicable standard)."</u> Pls.' Opp'n at 21 (emphasis added). Indeed. They also explain that "[t]his permitting regulation—[section] 122.44(d)—applies regardless of whether the TMDL has been developed." Pls.' Opp'n at 4. Plaintiffs describe very well the regulatory process at work: under section 122.44(d), if EPA "independently determine[s]" that plaintiffs' facilities have the reasonable potential to cause the Great Bay Estuary waters to exceed New Hampshire's water quality standards, it must impose nitrogen limits in plaintiffs' NPDES permits. The independent

determination that they mention is actually a determination EPA is required to make under section 122.44(d) when issuing permits. And just as section 122.44(d) applies whether or not a TMDL has been developed, it applies whether or not a body of water has been placed on the 303(d) list.[9]

This is not to say that 303(d) lists never affect permitting decisions—they just do so indirectly. Plaintiffs leap past an intermediate step. When a body of water is placed on the 303(d) list, the state must establish a TMDL for that body of water for pollutants that are "preventing or expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii); 33 U.S.C. § 1313(d)(1)(C). This is not an immediate process, however.[10] Moreover, before a state can establish a TMDL, it has to allow for public participation in the process. See 40 C.F.R. § 130.7(c)(1)(ii).

Once a TMDL is issued, it certainly can affect NPDES permits. When developing water-quality-based standards for those permits, EPA must ensure that those standards are "consistent with" the applicable TMDL. Id. § 122.44(d)(1)(vii). So, once a TMDL has been promulgated, the process for establishing water-quality-based standards in permits includes this step in addition to the reasonable potential determination. In this way, the promulgation of a TMDL for a particular body of water might affect the permits for each point source discharging into that body of water.

Here, New Hampshire has not established a nitrogen TMDL for the Great Bay Estuary waters. New Hampshire is obliged to do so, now that the waters are on the 303(d) list, but it does not have to do so within a particular time limit. Permitting decisions cannot take into

---

[9] Plaintiffs counter that a former New Hampshire official stated in a deposition that the 303(d) listing, even before a TMDL is established, triggers permitting limits. Of course, as plaintiffs surely realize, the Court will not defer to a witness's opinion on questions of law.

[10] States do not have a set time within which to promulgate a TMDL for a particular body of water after it is included on the 303(d) list. EPA then must approve or disapprove of the TMDL (and establish its own TMDL in the case of disapproval). 40 C.F.R. § 130.7(d).

consideration a TMDL that has not yet been promulgated. Hence, between the 303(d) listing decision and the permitting decisions lies another decision—one made by New Hampshire, not the EPA, and one in which plaintiffs may participate, and of which they may seek review. See 40 C.F.R. § 130.7(c)(1)(ii). Plainly, the simple fact of 303(d) listing does not "guarantee" more stringent nitrogen limits in plaintiffs' permits, much less guarantee them "immediately": any limits will be required as a result of the TMDL, not because of the 303(d) listing, and the uncertainty surrounding the as-yet-unpromulgated TMDL precludes any "guaranteed" conclusions. Pls.' Opp'n at 10, 13.

The 303(d) list also may affect permitting decisions in another indirect way, again involving an intermediate step. Plaintiffs are correct that EPA can and does consider 303(d) listing when making its reasonable potential determination. Pls.' Opp'n at 6 (limits in proposed and "promised" permits "based on the 303(d) impairment determination"). While the 303(d) listing might therefore make it more likely that plaintiffs will receive a permit with restrictive nitrogen limits, it by no means guarantees it. As explained above, the reasonable potential determination is complex and involves many factors. In the permit issued to a non-plaintiff city that discharges into the Great Bay Estuary waters, EPA explains at length the many bases for its decision. See Defs.' Reply Ex. 6, Newmarket Permit Fact Sheet, at 25-31. It does mention the 303(d) listing, but careful review makes it clear that the listing was far from the only thing EPA considered. Although the 303(d) listing may influence the permitting decision, because it is something EPA considers, it does not—as plaintiffs imagine—conclusively establish the reasonable potential required under section 122.44(d).[11]

---

[11] Final permitting decisions can be appealed to a court of appeals under 33 U.S.C. § 1369(b). Id. (review available in court of appeals embracing the district in which plaintiffs reside or transact business affected by EPA's decision); 40 C.F.R. § 1.25(e) (Environmental Appeals Board is final agency decisionmaker on administrative

At bottom, even if plaintiffs have suffered an injury, the link between the 303(d) listing decision and plaintiffs' injury is too attenuated. See Allen v. Wright, 468 U.S. 737, 759 (1984) ("The links in the chain of causation between the challenged . . . conduct and the asserted injury are far too weak for the chain as a whole to sustain [plaintiffs'] standing."). Because the section 122.44(d) permitting process is not controlled by EPA's 303(d) listing decisions, plaintiffs cannot establish causation under Article III.[12]

Plaintiffs counter with four cases in arguing that courts have granted review of 303(d) listings in similar situations. Those cases are all distinguishable. In the first two, Thomas v. Jackson, 581 F.3d 658 (8th Cir. 2009), and American Canoe Association v. EPA, 30 F. Supp. 2d 908 (E.D. Va. 1998), environmental groups challenged the omission of particular bodies of water from 303(d) lists. But in neither Thomas nor American Canoe Association did the deciding court address plaintiffs' standing to challenge the 303(d) listing decision.[13]

Next, plaintiffs cite Florida Public Interest Research Group Citizen Lobby, Inc. v. EPA, 386 F.3d 1070 (11th Cir. 2004) ("FPIR").[14] There, the Eleventh Circuit found that an

_____

appeals). That statute, providing for review of EPA's actions, notably omits section 1313 in listing reviewable actions. Of course, this is not dispositive, because plaintiffs likely could not sue under the APA if section 1313 were listed, but it does hint that Congress contemplated certain decisions—303(d) list approvals not among them—to be routinely reviewable.

[12] Plaintiffs also argue that because a permittee cannot challenge a 303(d) listing within an administrative permit appeal, "one must separately overturn the underlying impairment listing" in order "to stop the permit action." Pls.' Opp'n at 12. The Environmental Appeals Board rejected plaintiffs' counsel's challenge to a permit for another city that owns a wastewater treatment plant discharging into the Great Bay Estuary waters. See In re Town of Newmarket Wastewater Treatment Plant, NPDES Appeal No. 12-05, 2013 EPA App. LEXIS 43 (E.A.B. Dec. 2, 2013). Counsel argued in the course of that challenge that EPA's 303(d) listing decision was illegal. The Board rejected counsel's argument, explaining that "EPA's acceptance of the State of New Hampshire's impairment listing for the Great Bay estuary is a separate agency action that is not before the Board in this case." Id. at *105 n.28. Somehow, plaintiffs believe that this explanation helps their argument. In fact, the Board simply explains what is laid out above: 303(d) listings alone do not guarantee that permits will contain particular limits, so those listings are not relevant in permit challenges. Similarly, because permitting decisions are separate agency actions, governed by a separate regulation, overturning the 303(d) listing decision would not "stop the permit action." Pls.' Opp'n at 12.

[13] In addition, American Canoe Association is a district court case from another district. It thus cannot be, as plaintiffs maintain, "dispositive." Pls.' Opp'n at 16.

[14] In their brief, plaintiffs cite "Sierra Club v. Leavitt, 386 F.3d 1070 (11th Cir. 2007)." In the Federal Reporter, the case at 386 F.3d 1070 is FPIR. EPA helpfully points out that Sierra Club is actually found at 488 F.3d

environmental group had standing to challenge EPA's failure to review what plaintiffs believed to be a revised water-quality standard. 386 F.3d at 1082-85. That holding is very similar to this Court's previous holding that plaintiffs had standing to challenge EPA's failure to review what plaintiffs (erroneously) believed to be a revised water-quality standard (the 2009 Document).[15] EPA must review water-quality standards, and water-quality standards actually control many parts of the Act's scheme. For example, they govern whether a waterbody should be included on the 303(d) list; they also govern the reasonable potential determination in the permitting process. See 33 U.S.C. § 1313; 40 C.F.R. § 122.44(d). Hence, as explained in FPIR and in this Court's previous opinion, when EPA fails to review a revised water quality standard, plaintiffs such as the environmental group in FPIR and the plaintiffs here have standing because they have lost a procedural right, and that loss has concrete effects on their interests. FPIR at 1085; Mem. Op. at 8. But here, plaintiffs are challenging an entirely different action: EPA's approval of New Hampshire's 303(d) lists. Whether plaintiffs have standing to challenge that action is an entirely different question, and so FPIR does not help plaintiffs.

Plaintiffs also cite Barnum Timber Co. v. EPA, 633 F.3d 894 (9th Cir. 2011). There, the court found that the landowner plaintiffs had standing because of an injury directly caused by the 303(d) listing of a waterbody on their land—the land depreciated in value. Id. at 898-901. Unlike plaintiffs in this case, the Barnum Timber plaintiffs did not challenge the 303(d) listing because of its perceived regulatory impact; rather, they showed that the very fact that waters on their land were on the list caused their property values to go down. Id. at 898. If the waters were taken off

---

904 (11th Cir. 2007). That case is similar to Thomas and American Canoe Association, and similarly unhelpful to plaintiffs: an environmental group challenged the omission of particular bodies of water from 303(d) lists, and the court did not address standing. Sierra Club, 488 F.3d at 904-21. In FPIR, the Eleventh Circuit does address standing, but as discussed, it is distinguishable. 386 F.3d at 1082-85.

    [15] This Court did, however, distinguish the merits of FPIR. See Mem. Op. 11-12.

the list, their property value would go back up; hence, they could also show redressability. Id. at 901. Here, plaintiffs are concerned about the potential for restrictive permits. Whether those permits will contain restrictive limits is separate from whether the Great Bay Estuary waters are included on the 303(d) list. They have not yet received permits with restrictive limits, they cannot show that such restrictive limits would be caused by the 303(d) listing, and as explained below, reversing the listing decision would not prevent EPA from issuing restrictive permits.

3.     <u>Plaintiffs cannot show an injury that is redressable by the Court</u>

Any injury related to the permits is not redressable. Even if the Great Bay Estuary waters were taken off the 303(d) list, nothing would require EPA to issue plaintiffs less restrictive permits. Indeed, because the limits in the permits to be received by plaintiffs are determined through a separate agency determination under section 122.44(d), those limits would be unaffected. Just as the 303(d) listing did not cause the proposed restrictive limits in plaintiffs' permits, reversing the listing will not ease those limits.

In short, plaintiffs' injury related to the permits is speculative, is not caused by EPA's decision to approve New Hampshire's 303(d) list, and is not redressable by overturning the listing decision. Hence, plaintiffs do not have standing to challenge that decision.

**b.**     **Plaintiffs Do Not Have Standing Based On EPA Regulations On New Sources Or Dischargers**

Plaintiffs next argue that the waters' inclusion on the 303(d) list harms their ability to expand their waste treatment plants. Under 40 C.F.R. § 122.4(i), once a body of water has been listed as impaired, it becomes much more difficult for "new sources" or "new dischargers" to obtain an NPDES permit. Thus, plaintiffs argue that the 303(d) listing decision immediately precluded them from expanding their existing waste treatment plants. As EPA points out, though,

plaintiffs misread the regulation. Section 122.4(i) does not apply to expanding sources or expanding dischargers; it applies to new sources or new dischargers.

To qualify as a new source, plaintiffs' (hypothetical) expansion must be subject to performance standards under section 306 of the CWA. See id. § 122.2 (defining "new source"). Plaintiffs do not allege or argue that they are subject to those standards. Accordingly, any expansion would not qualify as a new source. Similarly, to qualify as a new discharger, plaintiffs' (hypothetical) expansion at the sites where they currently operate must have "never received a finally effective NDPES permit for discharges at that 'site.'" See id. (defining "new discharger"). But plaintiffs have received finally effective NDPES permits.[16] Consequently, any expansion would not qualify as a new discharger.

In addition, plaintiffs' entirely hypothetical desire to expand cannot support standing. Plaintiffs do not allege, for example, that they have actual plans to expand their facilities and that the relevant regulations will prevent them from doing so. See Lujan, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."). Because the waters' inclusion on the 303(d) list does not preclude plaintiffs from expanding their facilities under section 122.4(i), and because any plans to do so are hypothetical, plaintiffs do not have standing based on section 122.4(i).

### c.    Plaintiffs Do Not Have Standing Based On The Draft Stormwater Permit

Plaintiffs next contend that they are injured by the 303(d) listing because it purportedly caused the EPA to issue what plaintiffs consider to be a restrictive general stormwater permit. They argue that "the minute EPA approved the 303(d) nutrient impairments for Great Bay and its

---

[16] Plaintiffs have not, however, received finally effective NPDES permits with the restrictive nitrogen limits of which they complain.

tributaries, all of the Cities' various stormwater dischargers were presumed to be causing or contributing to the water quality exceedance and corrective measures were required for those sources also." Pls.' Opp'n at 8-9. But at "the minute EPA approved" the 303(d) lists at issue, EPA had issued only a draft revised stormwater permit for the State of New Hampshire connecting the 303(d) list with the stormwater permit. See 78 Fed. Reg. 9908, 9909, Draft "General Permits for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems" (Feb. 2, 2013).[17] EPA still has not issued the final version of that permit. Thus, despite plaintiffs' insistence to the contrary, the 303(d) list did nothing to affect their obligations as to stormwater discharge—that injury remains speculative.[18] "Allegations of possible future injury do not satisfy the requirements of Art. III." Whitmore, 495 U.S. at 158. Between now and issuance of the final permit, EPA may end up revising the standards to address plaintiffs' concerns. What is more, that decision does not depend on—and is not caused by—the 303(d) listing decisions. Similarly, plaintiffs note that the draft stormwater permit singles out the Great Bay Estuary waters as targeted by the permit, see Pls.' Opp'n at 8; but even if the Court reversed the 303(d) listing decisions, nothing would require EPA to no longer single out those waters. EPA could simply draft a new permit, appropriately justified under the applicable regulations, that singled out the Great Bay Estuary waters for stricter stormwater discharge limits without relying on their inclusion on the 303(d) list. Thus, plaintiffs cannot show redressability. And if EPA does issue a stormwater permit with which plaintiffs take issue, plaintiffs should challenge

---

[17] Available at http://www.epa.gov/region1/npdes/stormwater/nh/2013/NHMS4-NewDraftPermit-2013.pdf.
[18] Plaintiffs also argue that EPA's actions affecting another New Hampshire city, Newmarket, and its stormwater discharge obligations, support their standing argument. Opp'n 7-8. But Newmarket is not a plaintiff, and plaintiffs' fear that EPA will act in the same fashion towards them is speculative.

that permit, not the 303(d) list.[19] Hence, they cannot show standing based on the draft general stormwater permit.

### d.    Plaintiffs Do Not Have Standing Based On A Due Process Injury

Plaintiffs' final standing argument is that they were injured because EPA deprived them of due process when it approved the 303(d) list. They contend that "EPA approved the 2009 amended [303(d)] list without affording the public the opportunity for notice and comment on this amended list, in violation of applicable rules," Pls.' Opp'n at 18,[20] citing section 1313(d)(2) and Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 909 n.5 (11th Cir. 2007), in support of this argument. In Sierra Club, the Eleventh Circuit stated in a footnote that a 303(d) list became final "following a notice-and-comment period," and also cited section 1313(d)(2). 488 F.3d at 909 n.5. But examination of that latter section reveals nothing resembling a notice-and-comment requirement. It simply requires EPA to approve or disapprove of 303(d) lists within thirty days of submission; in the case of disapproval, the EPA must establish its own 303(d) list within thirty days. Anyone familiar with the plodding pace of administrative review knows that this relatively tight turnaround schedule does not contemplate an action that takes into account a notice-and-comment period. Simply put, the CWA does not contemplate plaintiffs' participation in the 303(d) list's approval, and they have hence not identified any procedural violation.

What is more, they cannot establish that EPA's actions, even if they were procedural violations, deprived them of a protected liberty or property interest. See Gen. Elec. Co. v. Jackson, 610 F.3d 110, 117 (D.C. Cir. 2010). Plaintiffs' allegations do not present a cognizable

---

[19] The Court does not opine on whether, or in what context, plaintiffs may challenge a stormwater permit.

[20] Plaintiffs also argue that "the EPA approval actions violated due process rights by effectively revising a state water quality standard without affording the Cities the opportunity for notice and comment." Pls.' Opp'n at 18. As explained in this Court's previous opinion, however, EPA did not revise a state water quality standard. See Mem. Op. at 6-9.

Article III injury. Put otherwise, a bare assertion of a procedural due process violation is not an Article III injury. Under settled precedent, plaintiffs do not have standing based simply on allegations that their due process rights have been violated. See Gen. Elec. Co., 610 F.3d at 117. The reason is straightforward: the Fifth and Fourteenth Amendments together guarantee that neither the federal government nor any state government will "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amends. V, XIV. Thus, unless a plaintiff is deprived of one of those interests without due process, that plaintiff has no claim. Gen. Elec. Co., 610 F.3d at 117 ("Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process."). It is the deprivation of a liberty or property interest itself that triggers procedural due process requirements, and that alleged deprivation is also the putative Article III injury. See Board of Regents v. Roth, 408 U.S. 564, 570 (1972) ("[T]he range of interests protected by procedural due process is not infinite.").

As explained above, the link between the 303(d) list approvals and EPA's permitting decisions under the NPDES system is simply too attenuated. Plaintiffs believe that the 303(d) list approvals have certain regulatory effects, but those regulatory effects are far from concrete. Inclusion on a 303(d) list will someday lead to the promulgation of a TMDL. That TMDL may someday lead to more restrictive permits. In the meantime, plaintiffs may receive restrictive permits because of an independent determination (made under a separate regulation—section 122.44(d)) that their current permits must limit the discharge of a particular pollutant. But until all that happens, the 303(d) list does not cause plaintiffs to suffer any injury. Hence, even if plaintiffs could identify a procedural violation (associated with the 303(d) list approval) that deprived them of due process rights, they cannot demonstrate that the violation deprived them of any protected liberty or property interest.

## III.    RIPENESS

EPA also moves to dismiss because plaintiffs' claims are not ripe.[21] The Court agrees. To satisfy Article III, plaintiffs must demonstrate that they face a present injury. See Wy. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999). To do this, they must show that the agency action is fit for judicial review and that they would face hardship if review is withheld. While EPA concedes that the agency action is fit for review, plaintiffs face no hardship if review is withheld. To determine whether plaintiffs face hardship, courts look to whether the challenged actions "command anyone to do anything or to refrain from doing anything," "subject anyone to any civil or criminal liability," or create "legal rights or obligations." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998). By themselves, the 303(d) lists do not affect plaintiffs. Permits with restrictive nitrogen limits—which have not yet been issued to plaintiffs—may create hardship for plaintiffs, but plaintiffs must challenge those permits through the administrative process provided in the CWA. See 33 U.S.C. § 1369(b) (providing for judicial review in the court of appeals embracing the district where plaintiffs reside or where they transact business that is directly affected by EPA's action); 40 C.F.R. § 1.25(e) (Environmental Appeals Board is final agency decisionmaker on administrative appeals). A final general stormwater permit with restrictive nitrogen limits—also yet to be issued—may also create hardship for plaintiffs. But reviewing the 303(d) lists would not alleviate either of those hardships—which do not yet exist. Hence, the case is not ripe for this Court's review at this time.

---

[21] This analysis necessarily overlaps with the Court's standing analysis. Wy. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) ("Closely akin to the standing requirement, and indeed not always clearly separable from it, is the ripeness doctrine.").

## CONCLUSION

Because plaintiffs cannot show that they have standing under Article III, and because plaintiffs cannot demonstrate that the challenged decisions by EPA are ripe for review, the Court will dismiss plaintiffs' amended complaint. A separate order has issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: April 14, 2014